```
                     UNITED STATES DISTRICT COURT

                     WESTERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA              15-CR-6109(G)

vs.
                                      Rochester, New York
EDWARD MIGHTY,                        September 7, 2017
            Defendant.                10:44 a.m.
- - - - - - - - - - - - - -X


                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE FRANK P. GERACI, JR.
              UNITED STATES DISTRICT CHIEF JUDGE



                    JAMES P. KENNEDY, JR., ESQ.
                    Acting United States Attorney
                    BY: ROBERT A. MARANGOLA, ESQ.
                    Assistant United States Attorney
                    6200 Federal Building
                    Rochester, New York 14614



                    JOHN C. PUTNEY, ESQ.
                    149 Main Street
                    Dansville, New York 14437
                    Appearing on behalf of the Defendant


ALSO PRESENT:       Jennifer Fish, U.S. Probation Office


COURT REPORTER:     Christi A. Macri, FAPR-CRR
                    Kenneth B. Keating Federal Building
                    100 State Street, Room 2120
                    Rochester, New York 14614
```

```
 1                      P R O C E E D I N G S
 2                        *        *        *
 3              (WHEREUPON, the defendant is present).
 4              THE COURT: Are you Edward Mighty?
 5              THE DEFENDANT: Yes, sir.
 6              THE COURT: Appear with your attorney Mr. Putney?
 7              THE DEFENDANT: Yes.
 8              THE COURT: Okay.  Mr. Marangola represents the
 9    Government in this matter.
10              This matter's on for sentencing.  The Court has
11    received and reviewed the presentence report.  I've also
12    received a statement from the defendant indicating that they
13    had no opposition to the presentence report; is that correct?
14              MR. PUTNEY: Yes.
15              THE COURT: Okay.  I do note that originally the
16    plea agreement did call for a potential 5K motion, and none
17    was filed; is that correct?
18              MR. MARANGOLA: That's correct, Your Honor.
19              THE COURT: Okay.  Does the Government have any
20    objection to the presentence report?
21              MR. MARANGOLA: It does not, Your Honor.
22              THE COURT: Based upon that the Court will adopt the
23    presentence report.
24              Did you want to be heard?
25              MR. MARANGOLA: Judge, I would ask that based on the
```

(Timestamps in left margin: 10:44:35AM line 5; 10:44:41AM line 10; 10:44:55AM line 15; 10:45:11AM line 20; 10:45:18AM line 25.)

```
           1   agreement as set forth in paragraph 16 and 17, the Government
           2   is bound to recommend a sentence within the guideline range of
           3   300 to 322 months.  I have no specific request within that
           4   range.
10:45:37AM 5                And I would just ask that the forfeiture provisions
           6   as agreed to in the plea agreement be included in the
           7   judgment.
           8                I have nothing further, unless the Court has any
           9   questions.
10:45:46AM10                **THE COURT:** Thank you.
          11                **MR. MARANGOLA:** Thank you.
          12                **THE COURT:** Mr. Putney.
          13                **MR. PUTNEY:** Your Honor, I don't have a lot to say
          14   because my familiarity with this case comes in after
10:45:56AM15   Mr. Mighty had already pleaded guilty.
          16                But in speaking with him, it appears that he was
          17   not well represented up to the time of the entry of the plea.
          18   He didn't have any discovery until after I provided it to him.
          19   His attorney only met with him two or three times leading up
10:46:15AM20   to the entry of the plea.  He never even saw the plea
          21   agreement until it was shown to him through the glass in the
          22   marshal's interview room.
          23                But Mr. Mighty has a lot more that he would like to
          24   say that will flesh out those complaints that he has.
10:46:35AM25                **THE COURT:** Sure.  Mr. Mighty, go ahead.
```

    **THE DEFENDANT:** Yes, Your Honor. Back on February 10th when I was first arrested --

    **THE COURT:** February 10th, 2015?

    **THE DEFENDANT:** Yes, 2015, when I was arrested, me and my co-defendants, this kind of rough, we -- it was -- I was coming from drug court program at the time.

    I was arrested outside of 54 Strong Street where I guess state officials had a warrant for this premises. As they handcuffed us, they searched the premises and went inside and they end up bringing us inside the premises.

    After probably 45 minutes they found the gun that they retrieved from the basement. I guess then we were taken down to the Public Safety Building, questioned about my involvement. I denied the involvement.

    They told me about the drugs that they seized in a vehicle, and they told me they were going to charge me with possession charges.

    And I asked them, well, how could that be? I was arrested outside this, you know, this premises and you brought me inside.

    Two days later, I believe, we end up on the 13th going to state court. The charges were dropped, and I guess a complaint was filed.

    At the time I hired Mr. Siguenza. Mr. Siguenza came and represented me. I believe the initial appearance was

1  on the 17th of February.  He explained a few things to me, not
2  too much when I seen him that day.
3           March 18 was the first time I met with Siguenza.
4  He came out to Livingston County Jail for the first time, we
5  went over a few -- a few details about this case here.  He
6  said he had some discovery that he looked into, listened to
7  some wiretaps, but he couldn't really see too much of my
8  involvement at the time.
9           But at the same time what happened in 2014, I
10 explained to him my situation in 2014.  What took place, my
11 arrest back in 2014.  He actually said, well, I guess, you
12 know, Mr. Marangola here would like to speak to me.  And if I
13 didn't want to speak, then I'll be looking at a chance of high
14 severity of, you know, getting smoked in the courtroom if I
15 took it to trial or did anything.
16          And, I mean, I knew Mr. Siguenza almost four years
17 living in Rochester.  We lived in the same apartment building,
18 he knew my family.  So I took his advice to a lot of things.
19 He mentioned probation and a lot of other things to me.  It
20 was a lot of promises made.
21          I didn't tell you these things back on August 31st,
22 2015, because I went off his word.  Had I known he was not
23 qualified to either practice in this jurisdiction, he advised
24 a lot of this stuff.
25          I came to find out after I end up going out to Ohio

1  May 2016, I end up getting a docket sheet.  I tried to reach
2  out to Mr. Siguenza starting from March 2016 with letters,
3  trying to reach out to him, telling him I had a change of
4  heart in my case and that where is my discovery, you know.  He
5  told me he filed motions, which he never filed any motions.
6             Up to the time when I tried to reach out to him, I
7  probably spoke to Mr. Siguenza roughly twice when I was in
8  Ohio.  He told me that, you know, he's looking into my case,
9  he kept leading me astray.
10            I did do some cooperation with him with the state.
11 That he told me that they promised that they will be getting
12 me out for this triple homicide situation I had in the state
13 in 2014.
14            I met with Mr. Marangola one time.  He basically
15 explained to me as much as I give to him how he treat me.
16 Well, looking into my case right now, other co-defendants
17 being charged with 500 grams, 28 grams, I'm being charged with
18 5 kilos and possession of narcotics, firearm that I never had
19 on my possession, but I guess it's how the conspiracy works.
20 I was dumbfounded to all this stuff.
21            A firearm that wasn't on the warrant, you know,
22 things of these nature that I couldn't know or see unless I
23 had discovery at the time.
24            So me pleading to these charges, I went off of
25 Siguenza's good faith that I thought he had just because I

1 knew him for a long time and a family friend.

2 He showed me my plea agreement in the back of the
3 Marshal's Office.  They called me in one day, August 31st, he
4 never told me I was coming to plea that day.  He told me in
5 the court.  I sat with him in the back.  He said, well, I
6 believe, you know, the first horse to the well drinks the
7 water.  Gave me all these promises.  After that, Your Honor, I
8 just been here stuck.

9 When I came in and put in the motion for a
10 dismissal of the complaint, it's because I went through, you
11 know, all this paperwork, what I had with the docket sheet and
12 just these wiretaps, paperwork of these wiretaps.  That's all
13 I had to work with at that time when I was out in Ohio for 11
14 months.

15 I had some help with some other inmates that, you
16 know, been in jail a long time, been back and forth and kind
17 of knew the system, I guess, a little bit.  So that's when I
18 put in for my speedy trial rights, my preliminary hearings
19 that I never had, which I have documents proving that I was
20 supposed to come in for a preliminary hearing and they just
21 pushed it all the way back to a plea negotiation date.  So now
22 I'm just in a drastic situation.  So I couldn't change it
23 after that.

24 But before the plea agreement I was promised all
25 these other things, which never took place.  I went over this

1 PSR report. That was the last time I seen him, I believe
2 November 18, 2015, and that was the last time he spoke with me
3 and said, you know, well, I'll be back to talk to you, you
4 know, I rather you just stay in custody right now just to --
5 just to, you know, go through what you have to go through now,
6 but you probably be looking at some type of probation. I sat
7 there, I took his word.
8     **THE COURT:** This is after the plea?
9     **THE DEFENDANT:** After the plea agreement.
10     **THE COURT:** Okay.
11     **THE DEFENDANT:** We went and spoke with the state
12 officials again. I sat with Kelly Wolford and a bunch of
13 those people in the state. I gave them everything I possible
14 knew. She even said she would show up today and to back my
15 situation and everybody turn they back against me.
16     I just feel like it's a whole vindictive thing
17 against me because of what happened in 2014, Your Honor. I
18 never had no parts in it, I never had no problem with my
19 background showing a little background with a few charges, but
20 I'm not a violent person, I never carried firearms, I got some
21 drug activity that's going on.
22     But if you can see, I always pled out and I always
23 stood firm to, you know, what I did even if I felt like, you
24 know, I was cheated out of my situation.
25     I'm just in a rough situation right now. I got

```
 1  family and friends that love me, I got my mother in the back
 2  here that always shows up, that's been there, that's took care
 3  of me.  I got family that needs me out there.
 4              Like, I mean, this is my first time in this
 5  situation.  So, you know, it's rough on me right now.  It's
 6  real rough.  Looking at these numbers and this time, there's
 7  no way I would have ever pled to this situation if I didn't
 8  trust Mr. Siguenza at all.
 9              You know, so I'm just asking you, Your Honor, you
10  know, however you judge me today, that you just judge me
11  justly, not because of somebody else's personal, you know,
12  feelings over this situation and what they have against me
13  because I'm not that type of person.
14              **THE COURT:** Okay.  Anything else?
15              **THE DEFENDANT:**  No, sir.
16              **THE COURT:** Okay.  Are you not acknowledging your
17  responsibility for this offense now?
18              **THE DEFENDANT:**  Excuse me, Your Honor?
19              **THE COURT:** Are you not acknowledging your
20  responsibility?
21              **THE DEFENDANT:**  Yes, I'm acknowledging my
22  responsibility.
23              **THE COURT:** Okay.  All right. That's the first
24  thing.  That's important obviously.
25              **THE DEFENDANT:**  Yes, sir.
```

10

  1                 **THE COURT:** The second thing is as far as
  2  Mr. Siguenza goes, he's an experienced lawyer.  He was a
  3  prosecutor for several years in Monroe County before he was a
  4  defense attorney, and he's done a very good job for a lot of
  5  people.
  6                 **THE DEFENDANT:**  Yes.
  7                 **THE COURT:** This case really was contingent upon a
  8  potential 5K.  I think that's where then the Court could have
  9  some discretion in sentencing.  But without that, there is
 10  nothing -- there's mandatory minimums here, you understand
 11  that; is that right?
 12                 **THE DEFENDANT:**  Yes.
 13                 **THE COURT:** That's where we are at this point.
 14                 Now, you've been convicted three, four times of
 15  drug charges in the past now five -- in the past ten years.
 16  Where has it gotten you ?
 17                 **THE DEFENDANT:**  As you can see, nowhere.
 18                 **THE COURT:** Right.
 19                 **THE DEFENDANT:** Standing in courtrooms.  And like I
 20  said, I took responsibilities for those charges, which some of
 21  them I can say, you know, I was in vehicles where -- someone
 22  else's vehicles and -- but I still took my responsibility for
 23  being in that place at that time.  I always finished out my
 24  probation or any programs that was given to me.  I never
 25  violated any of them.

1   **THE COURT:** When were you in drug court?

2   **THE DEFENDANT:** Yes, I was in drug court.

3   **THE COURT:** When was that?

4   **THE DEFENDANT:** That was -- I was in drug court

5   2014. Was it 2014? Yes.

6   **THE COURT:** What did you learn from that?

7   **THE DEFENDANT:** As I was going through the drug

8   court program I never had any problems at all. No problems at

9   all.

10   **THE COURT:** After that you got back into this,

11   right?

12   **THE DEFENDANT:** Yes, sir.

13   **THE COURT:** So what did you learn?

14   **THE DEFENDANT:** Honestly, Your Honor, going through

15   the Drug Court Program, I was in a transition to where, you

16   know, me and my wife was going through some problems. I was

17   drinking a lot.

18   I'm actually a party promoter, I've been doing that

19   all my life, promotions and everything and parties, you know,

20   I spoke with my counselor out there, you know, it was one time

21   in the beginning when I first got to the program when I tested

22   for dirty urine, that was for alcohol, but at the same time I

23   had no other problems throughout that.

24   I was seeing them on a regular basis, and I had a

25   few months before I was actually going to be done with the

```
 1  program and graduate out of the program.  It's just that that
 2  night, February 10th, 2015, when I end up pulling up to that
 3  house and everything else just came down, the whole time since
 4  I've been here.
```

10:57:38AM  5        **THE COURT:** Were you involved in drug court then?

      6        **THE DEFENDANT:** Excuse me?  Yeah, I was in drug
      7  court then.

      8        **THE COURT:** You were in drug court and you were
      9  dealing drugs, right?  You just admitted that, right?

10:57:49AM 10        **THE DEFENDANT:** Yes, sir.

     11        **THE COURT:** So you didn't learn from drug court
     12  apparently.

     13        **THE DEFENDANT:** Well, Your Honor, like I said, I
     14  was in drug court and I have myself in a tight situation.
10:58:03AM 15  Involved around with people that were dealing drugs and with
     16  myself actually being around too, Your Honor.

     17        **THE COURT:** Okay.  All right. Hopefully you've
     18  learned something from this.  Obviously, it's costing you a
     19  lot of time.

10:58:17AM 20        But as far as Mr. Siguenza goes, I went very
     21  carefully through this plea agreement with you on that date
     22  August 31st, 2015, and you indicated you understood everything
     23  and answered all the questions properly.

     24        As I indicated, Mr. Siguenza is a very experienced
10:58:35AM 25  attorney, prosecuted cases for years before he became a

13

defense attorney.

And you have, once again, acknowledged your responsibility for the involvement in this case.  I think what you wanted was this to go away and it wasn't going to happen.

The motion Mr. Siguenza could not make is a motion for a change of facts.  The facts are the facts.  That's where you're stuck.

In this case the defendant did plead guilty to two charges on August 31st, 2015, to conspiracy to possess with intent to distribute cocaine and cocaine base; and a second count of possession of a firearm in furtherance of a drug trafficking crime.

There are several co-defendants on this case.  One co-defendant, Harper, who received a sentence of 180 months imprisonment; and another defendant by the name of Samuels, who received a 60 month period of imprisonment.

The defendant is 40 years of age.  Has a high school degree.  Is a United States citizen.  He did plead guilty after waiving indictment and pleading guilty to a two count information.

This involved a conspiracy between October 2014 and February 2015 for possession with intent to distribute cocaine and cocaine base.  Ultimately resulted in an arrest on February 10th, 2015.

The defendant was found in possession of a .357

1   caliber revolver and a .40 caliber Glock, which was recovered
2   from 54 Strong Street upon the execution of a search warrant.
3   There was also $3,592.30 that was also seized at that time.
4               The defendant was identified as one of the leaders
5   of the Rochester drug operation which involved kilo quantities
6   of cocaine being transported from Brooklyn, New York to
7   Rochester, New York.  This was an extensive investigation over
8   a long period of time which involved seven separate eavesdrop
9   warrants, many of which the defendant was intercepted having
10  conversations regarding this drug trafficking operation.
11              A search warrant was conducted at 54 Strong Street,
12  and also on Alphonse Street, both in the City of Rochester.
13              There were up to 50 kilograms of cocaine involved
14  in this operation over its lifetime.
15              The base offense level is a level 32.
16              There was a two level increase for maintaining a
17  premises for the purpose of manufacturing and distributing
18  controlled substances.
19              An additional four level increase based upon the
20  defendant being an organizer or leader and playing an
21  aggravating role in the conspiracy.
22              He does receive a three level downward adjustment
23  based upon his acceptance of responsibility and his plea of
24  guilty, and once again today acknowledging his responsibility
25  for his involvement in this criminal activity, resulting in a

15

```
 1  total offense level of 35.
 2              Regarding Count 1, with a total offense level of
 3  35, criminal history category of III, the sentencing range
 4  under the guidelines involves a term of imprisonment between
 5  240 months and 262 months.
 6              Count 2, the firearms charge, requires a mandatory
 7  60 month period of imprisonment to be run consecutively,
 8  resulting in a guideline sentence between 300 months and 322
 9  months.
10              It should be noted that Count 1 requires a minimum
11  period of imprisonment of 20 years, and Count 2 requires a
12  consecutive five-year period of imprisonment, which would mean
13  the minimum term is the 300 months.
14              The defendant's criminal history includes a
15  disorderly conduct in 2000, aggravated unlicensed operation
16  motor vehicle also in 2000.
17              A conviction in 2005 of attempted criminal
18  possession controlled substance, and also criminal possession
19  controlled substance seventh degree.
20              2007 criminal possession of marijuana in the fourth
21  degree.
22              And in 2014 criminal possession of marijuana in the
23  third degree.
24              The defendant was born in Rochester, New York.  Was
25  married in 2007, separated in 2011.  Does not have any
```

1 children.  Health issues include high blood pressure and
2 anxiety.  He did consume alcohol.  Is a graduate of John
3 Marshall High School until he withdrew from there.
4 Was a music promoter for All Star Events and also
5 previous owner in a home daycare.
6 The Court has considered a number of factors in
7 determining the appropriate sentence here.  In this case the
8 Court's very limited obviously because there's mandatory
9 minimum sentences in this case on Count 1 of the 20 years, 240
10 months, and on Count 2, 60 months, to run consecutive.
11 The Court has to consider the nature of the crime
12 in this case; obviously, distribution of large quantities of
13 cocaine from Brooklyn to Rochester, New York.
14 The defendant's role in that; he was a leader or
15 organizer of that operation which brought cocaine into this
16 community.  Obviously, that is a poison that destroys
17 individuals and families and communities that was existing
18 over a long period of time.
19 The defendant was involved apparently with drug
20 court at the time when he was engaging in drug dealing, in
21 addition to his previous convictions for possession and
22 dealing drugs in the past.
23 The sentence has to reflect the seriousness of the
24 offense.  Also deter the defendant and others from engaging in
25 this activity in the future.

1             This was a case in which there was a potential 5K
2 situation where there could be a recommendation for a sentence
3 below the minimum, but in this case apparently the defendant
4 did not fulfill any obligations under that and, therefore,
5 there was no 5K motion by the Government in this case.
6             Based upon the large scale nature of this crime,
7 the defendant's history and background, the fact that there
8 was no 5K motion or recommendation in this case, the
9 defendant's history of involvement with substance abuse and
10 the large scale operation that was involved in this particular
11 case, it's the sentence of the Court that the defendant be
12 sentenced on Count 1 to 240 months of imprisonment, and on
13 Count 2 to 60 months of imprisonment to be run consecutively,
14 for a total of 300 months of imprisonment.
15             He's also to be sentenced to 10 years of supervised
16 release on Count 1, and five years of supervised release on
17 Count 2 to run concurrent, with a number of conditions,
18 including that he not commit any violations of federal, state
19 or local law.
20             That he not possess any firearms or dangerous
21 devices.
22             That he not possess any illegal controlled
23 substances.
24             That he submit a sample for DNA analysis.
25             He submit to drug testing, submit to a drug

```
 1  substance abuse evaluation and follow any treatment
 2  recommendations.
 3              Submit to mental health testing and evaluation and
 4  follow any treatment recommendations.
 5              That he submit to a search of his person, property,
 6  vehicle or residence upon reasonable suspicion.
 7              I'm not going to impose any fine based upon the
 8  length of the sentence.
 9              There is a $100 special assessment on each of the
10  Counts 1 and 2 for a total of $200.
11              There's also a forfeiture of certain property,
12  including one Glock .40 caliber semi-automatic handgun; 11
13  rounds of .40 caliber ammunition; one Smith and Wesson .357
14  caliber revolver; six rounds of .357 ammunition; and $3,592 in
15  U.S. currency.
16              Do you move to dismiss the complaint?
17              **MR. MARANGOLA:** I do, Your Honor.
18              **THE COURT:** Yes, the underlying criminal complaint
19  will be dismissed.
20              Mr. Mighty, I know you raised a number of issues
21  throughout these proceedings.  I notify you of your right to
22  appeal in this case and raise certain issues.
23              The Court did impose a sentence in accord with the
24  plea agreement.  Therefore, I think you've waived your right
25  to appeal the sentence, but if there are other issues in this
```

1 case, of course you need to discuss that with Mr. Putney and
2 raise those on appeal, okay?
3     **THE DEFENDANT:** So my right to appeal, I can have
4 the right to appeal what, Your Honor?
5     **THE COURT:** Well, different issues. You've raised
6 issues -- speedy trial issues, you raised an issue regarding
7 your attorney, things of that sort.
8     I'm sure Mr. Putney will describe those potentials
9 with you, but you still have a right to raise those issues
10 with the Second Circuit if you elect to do that.
11     Anything further, Mr. Marangola?
12     **MR. MARANGOLA:** No, thank you, Judge.
13     **THE COURT:** Mr. Putney?
14     **MR. PUTNEY:** No, Your Honor, thank you.
15     **THE COURT:** Probation?
16     **MS. FISH:** No, Judge.
17     **THE COURT:** Thank you, good luck.
18     (**WHEREUPON**, proceedings adjourned at 11:08 a.m.)
19                     \*   \*   \*

**CERTIFICATE OF REPORTER**

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York before the Honorable Frank P. Geraci, Jr. on September 7th, 2017.

S/ Christi A. Macri

Christi A. Macri, FAPR-CRR
Official Court Reporter